# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DIOCESE OF ST. PETERSBURG, INC.,

     Plaintiff,

v.                            Case No: 8:15-cv-1977-T-30AEP

ARCH INSURANCE COMPANY,

     Defendant.

---

## ORDER

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment (Dkt. 23), Defendant's Response in Opposition (Dkt. 30), and Plaintiff's Reply (Dkt. 34). After a careful review of these filings, the evidence on record, and the applicable law, the Court concludes that Plaintiff has proven the absence of any genuine issue of material fact. For this reason, which will be discussed more fully below, Plaintiff's summary judgment motion will be granted.

## BACKGROUND

Plaintiff in this insurance coverage dispute is the Diocese of St. Petersburg, Inc. (the "Diocese"), and it seeks a declaratory judgment that a policy Defendant Arch Insurance Company ("Arch") issued to the Diocese's lessee, the Boys & Girls Clubs of Tampa Bay, Inc. (the "Boys and Girls Club"), covered the Diocese as an "additional insured." Arch agrees with the Diocese's assessment of the material facts, which largely concern the lease, the relevant provisions of the insurance contract, and an underlying negligence lawsuit

against the Diocese and the Boys and Girls Club. Arch's only genuine point of contention, which is the issue that will resolve this case, is whether those facts fall within the "additional insured" provision of the insurance policy.

**Undisputed Facts**

The Diocese owns real property in Riverview, Florida, on which they operate the Resurrection Catholic Church. In 2006, the Diocese and the Boys and Girls Club entered into a long-term lease arrangement that involved the construction of a Boys and Girls Club youth center on the church property. As part of that construction, the youth center sewage system was conjoined with the already-existing underground sewage system of the church. This plumbing system contained what is known as a "clean-out valve," which is a section of pipe that rises from the main sewer line to the surface so as to provide easier access should the sewage system get backed up and need repair. At the point at which the pipe reaches the surface, it is covered with a pipe-fitting cap.

The clean-out valve on the church property was positioned in a grassy area on a portion of the property leased to the Boys and Girls Club, between the church and the youth center, between two parking lots the church and the youth center shared. The clean-out valve's cap protruded just slightly above the sod.

Construction on the youth center completed in late 2011, after which the Boys and Girls Club began to use it periodically as provided in the lease.

I.    **The Lease**

The thirty-year lease between the Diocese and the Boys and Girls Club generally permitted shared use of the youth center. During certain periods, however, the lease

2

provided for one party's exclusive use. The Boys and Girls Club, for instance, had exclusive use all weekday afternoons during the academic school year. (Dkt. 24-1, p. 9). The Diocese had exclusive use all day on Sundays. (Id.). The lease did, however, provide the Diocese with the right to enter the youth center to inspect it.

Among other obligations, the lease made the Boys and Girls Club responsible for providing utilities and making necessary repairs to structural elements, to include plumbing lines. The lease also required the Boys and Girls Club to acquire general liability and other types of insurance coverage, and specified that the Diocese shall be added as an additional insured on that coverage. (Id. at 15). As to this coverage, the lease further specified that it "shall be primary and any coverage or self-insurance of the Diocese [] shall be in excess."

## II.    The Insurance Contract

The Boys and Girls Club acquired this policy, a commercial general liability policy, from Arch in the state of Florida. (Dkt. 14-3). As required by the lease, the policy contained an "additional insured" provision. In fact, it had two. The first applied to lessors and managers:

> **M)   ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES**
>
> The following is added under SECTION II – WHO IS AN INSURED:
>
> 1)   Persons or organizations for their liability arising out of the ownership, maintenance, or use of that part of the premises leased to you.

(Dkt. 14-3, p. 177) (emphasis in original). The second applied to parties with whom the Boys and Girls Club contracted, and it applied more narrowly to the Boys and Girls Club's vicarious liability:

**N)   ADDITIONAL   INSURED - BY   CONTRACT, AGREEMENT OR PERMIT**

a)  Persons  or  organizations  are  insured  under  this endorsement if you are required to add them as additional insureds to this policy by a written contract, written agreement, or permit which was:

    a)  In effect  or  takes  effect  during  the  term  of  this policy; and
    b)  Executed  prior  to  any  "bodily  injury,"  "property damages," or "personal and advertising injury.["]

b)  Insurance for the additional insured under this endorsement applies as follows:

    a)  The  person  or  organization  is  only  an  additional insured for liability caused by your negligent acts or omissions at or from:

        (1) Premises you own, rent, lease, or occupy, or
        (2) Ongoing  operations  you  perform  for  the additional insured at the job described in the written contract or written agreement.

(Id.) (emphasis in original).

The policy also contained a provision specifying that, with a few exceptions (none of which are applicable here), it was to be the primary insurance. The policy covered the period from March 1, 2013 to March 1, 2014, during which time Mrs. Sylvia Soriano was a parishioner at the Resurrection Catholic Church.

4

### III.    The Underlying Lawsuit

On December 15, 2013, a Sunday, Soriano drove to church to attend mass. Because the parking lots were full, she parked, as other parishioners did and regularly had, on an unpaved grassy area next to a paved parking lot. Shortly after she got out of her car, she tripped on the clean-out valve's cap and fell to the ground.

Soriano sued both the Diocese and the Boys and Girls Club in Florida state court for the personal injuries she suffered in the fall. (Dkt. 1-2). Against both, the lawsuit alleged negligence in failing to warn of risks, to inspect, to guard against foreseeable dangers, and to repair a known unsafe condition. (Id. at 4-5). Soriano's husband also sued, for loss of companionship and consortium. (Id.).

The Diocese—through its excess insurance provider Catholic Mutual, and later through the counsel retained to defend Soriano's claims—requested that Arch defend and indemnify the Diocese per the terms of the "additional insured" provision of the Boys and Girls Club policy. (Dkt. 26, p. 2-3). Arch denied the requests.

At a mediation held in October 2015, Soriano settled her claims against both the Diocese and the Boys and Girls Club. The settlement required the Diocese and the Boys and Girls Club to jointly pay the Sorianos $100,000. Catholic Mutual, on the Diocese's behalf, paid $50,000. To defend the Diocese, Catholic Mutual paid an additional $25,849.79 in attorney's fees and court costs. (Id. at 4).

## DISCUSSION

The Diocese seeks a declaration that Arch had a duty to defend the underlying lawsuit and, now that the underlying lawsuit has been settled, has a duty to indemnify

Catholic Mutual for the settlement, costs, and fees it paid on the Diocese's behalf. Stated differently, the Diocese claims that Soriano's underlying lawsuit falls within the additional insured provision in the policy Arch provided to the Boys and Girls Club. Arch argues that the underlying lawsuit does not. The Diocese moves for summary judgment.

### Summary Judgment Standard

A motion for summary judgment forces a court to "pierce the pleadings and [] assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Motions for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue over any material fact and that the moving party is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The existence of any factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; instead, the record must reveal a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). Facts are material if, under the applicable substantive law, they might affect the outcome of the case. *See id*. And disputes over those facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*.

A court ruling on a motion for summary judgment must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson,* 477

U.S. at 255. After the non-moving party has responded to the motion, the court must grant summary judgment if no genuine issues of material fact exist and the moving party deserves judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

### Insurance Contract Construction

The parties agree that Florida law governs this dispute. *See LaFarge Corp. v. Travelers Indemnity Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997) (internal citations omitted). Under Florida law, ordinary contract principles apply to the interpretation and construction of insurance contracts, and as with all contracts, the interpretation is a question of law. *See Fabricant v. Kemper Independence Ins. Co.*, 474 F. Supp. 2d 1328, 1331 (S.D. Fla. 2007) (citing *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. 4th DCA 2002). When the insurance policy language is unambiguous, the contract must be enforced as written. *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 734-35 (Fla. 2002).

Ambiguities occur when the language "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage." *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004) (internal quotation marks and citations omitted). In those cases, courts should resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy's language that provides coverage, rather than the competing interpretation that does not. *Id.* at 785-86. Similarly, clauses providing coverage should be interpreted in the broadest possible manner to effect the greatest amount of coverage, *Fabricant*, 474 F. Supp. 2d at 1331 (citing *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 5th DCA 1997), while exclusionary clauses should be strictly construed. *Westmoreland*, 704 S. 2d at 179.

As courts seek to arrive at a reasonable interpretation, "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties— not a strained, forced, or unrealistic construction." *Siegle*, 819 So. 2d at 736. Insurance contracts should be read as a whole, and each provision should be given its full meaning and operative effect. *See Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). And finally, as a matter of state substantive law, this endeavor to interpret must adhere to the relevant guidance of the state appellate courts. *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004).[1]

### *"Liability Arising Out Of . . ."*

Florida law applies different standards to an insurance company's duty to defend a lawsuit and its duty to indemnify losses. *See State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, n.3 (Fla. 1998) ("The duty to indemnify is determined by the underlying facts of the case . . . whereas the duty to defend is controlled by the allegations in the [underlying] complaint") (internal citations omitted). Here, however, those differences are not meaningful, because the Diocese and Arch agree on the underlying facts. The case instead hinges on their disagreement over the legal question: whether those underlying facts cover the Diocese as an additional insured within the policy. More

---

[1] To include intermediate appellate courts, unless there is some persuasive indication that the state's highest court would interpret the provision differently. *Insurance Co. of N. America v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991). In the end, the objective of the federal court sitting in diversity "is to determine the issue . . . as [it] believe[s] the Florida Supreme Court would." *Steinberg*, 393 F.3d at 1231 (internal citations omitted).

narrowly, this case hinges on whether the underlying lawsuit qualifies as "liability arising out of the ownership, maintenance, or use of" the youth center. As explained below, the Court finds that it does.

Florida appellate courts have determined that the phrase "arising out of," while it denotes causation of some kind, does not mean "caused by." *O'Dwyer v. Manchester Ins. Co.*, 303 So. 2d 347, 348 (Fla. 3d DCA 1974). It is broader, viewed in Florida courts as a causal connection less stringent than "proximate cause." *O'Dwyer v. Manchester Ins. Co.*, 303 So. 2d 347, 348 (Fla. 3d DCA 1974) (citing *National Indemnity Co. v. Corbo*, 248 So. 2d 238, 240 (Fla. 3d DCA 1971). "Arising out of" has been interpreted to mean "originating from," "growing out of," or "flowing from." *St. Paul Fire & Marine Ins. Co. v. Thomas*, 273 So. 2d 117, 120 (Fla. 4th DCA 1973) (internal quotation marks and citations omitted). And these related definitions have in turn been summarized broadly as meaning "incident to" or "having connection with." *Hilton Hotels Corp. v. Employers Ins. Of Wausau*, 629 So. 2d 1064, 1065 (Fla. 3d DCA 1994) (quoting *St. Paul Fire & Marine*, 273 So. 2d at 120). At least one Florida court, however, has required a tighter causal nexus in the case of a real property lease, concluding that, to "arise out of," the accident must occur on the leased premises or at least be in some way physically connected to the premises. *See Hilton Hotels Corp.*, 629 So. 2d at 1065 (citing similar holdings from other jurisdictions).

That case, *Hilton Hotels*, is also factually on point and, by way of its striking distinction, demonstrates why Florida law demands coverage here. There, a Hilton hotel chain leased space to a hotel services company, which used the space to operate a gift shop. 629 So. 2d at 1064. As required by the lease, the services company acquired a general

liability policy that named the hotel as an additional insured, "but only with respect to liability arising out of the ownership, maintenance, or use" of the gift shop. *Id.* at 1064-65. On the way to work one day, a gift-shop employee fell in the hotel lobby. The employee sued the hotel, and the hotel sought indemnity from the gift shop's insurer under the policy's additional-insured provision. *Id.* at 1065.

The trial court granted summary judgment in favor of the insurer, and Florida's Third District Court of Appeals affirmed. Noting Florida's broad definition of "arising out of," the Third District nonetheless found that, on the facts before it, summary judgment was appropriate.

Two facts, in particular, were critical. "First, and most importantly," the court found, "this accident did not physically occur on the premises which were covered by the policy, i.e. the gift shop." *Id.* And second, the court found no physical nexus between the location where the accident did occur and the premises. "The accident was not a result of any physical condition which emanated from the premises, such as flowing liquid, an escaped animal, or a runaway vehicle." *Id.* (citing premises liability research). In fact, the court said, "the only way that this accident was even remotely related to the gift shop[] was due to the pure coincidence" that the underlying plaintiff was an employee. Such an "isolated connection," the court concluded, did not arise out of the gift shop's use and thus did not fall within the additional-insured provision of the policy. *Id.*

Here, the critical facts lie in near diametric opposition. First, it is undisputed that Soriano fell on a portion of the property that was leased to the Boys and Girls Club. And second, it is undisputed that the sewage system that caused Soriano's fall emanated from

the leased youth center, specifically its sewage system. Far from isolated "pure coincidence," this connection to the youth center was physical, and central to the lease itself.

These opposing facts compel the opposite result. In fact, *Hilton Hotels* is so factually similar to this case, and the Third District's analysis is so pointed, that the Court has no difficulty concluding that, despite its apparent criticism of Florida's broad "arising out of" definition, the court there would have found that Soriano's fall arose out of the Diocese's use of the leased youth center property. The *Hilton Hotels* court would have found that her fall was covered by the additional-insured provision of the Arch policy. Given Florida law's stated preference for broad coverage, and the other appellate case law defining "arising out of" even more broadly than it was in *Hilton Hotels*, the Court is convinced that the Florida Supreme Court would have, too.

Accordingly, this Court finds that the facts of the underlying lawsuit arose out of the Diocese's use of the youth center. *See Steinberg*, 393 F.3d at 1231 (11th Cir. 2004). The Diocese qualifies as an "additional insured" under the Arch policy issued to the Boys and Girls Club. Arch had a duty to defend and has a duty to indemnify.

The Court roundly rejects Arch's argument that the "arising out of" language was intended to apply only to the Diocese's vicarious liability for the Boys and Girls Club's negligent acts. Two considerations demonstrate the argument's futility. First, this position does not square with the 45-year-old Florida case law defining the phrase more broadly, as discussed above. *See Corbo*, 248 So. 2d at 240 (in 1971, approving the definition "causally connected with" and finding that dog bite to vehicle passenger fell within arising-out-of

11

provision in car insurance contract). Nor does it square with Florida's long-standing history of interpreting ambiguous insurance contract provisions in favor of broad coverage. *Travelers Indem. Co.*, 889 So. 2d at 785. If Arch wanted this provision to apply only to vicarious liability, it would have more plainly said so.

Second, Arch did precisely that—but in a different provision. After covering managers and lessors "for their liability *arising out of* the ownership, maintenance or use" of the youth center, the Arch policy, in the very next provision, covered those for whom status as an additional insured was required by contract, but only "for liability caused by *your negligent acts or omissions*." (emphasis added). This second "additional insured" provision much more clearly refers to vicarious liability. *See Siegle*, 819 So. 2d at 736. To read the previous provision as referring to the exact same kind of liability would be to deny the phrase "arising out of" its "full meaning and operative effect." *See Auto-Owners Ins. Co.*, 756 So. 2d at 34. It would render the phrase superfluous. Under Florida law, and according to a time-honored rule of textual interpretation, this is an interpretation the Court must reject. *See Siedle v. Nat'l Ass'n of Securities Dealers, Inc.*, 248 F. Supp. 2d 1140, 1144 (M.D. Fla. 2002) ("The law compels that a contract should not be interpreted in a manner that would render a word, or term, extraneous.") (citing *Golden Door Jewelry Creation, Inc. v. Lloyds Underwriter Non-Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir. 1997)); *see also* Restatement (Second) of Contracts, § 203(a) (1981). The Arch policy did provide additional insured coverage for vicarious liability, after it provided much broader additional insured coverage for the Diocese as lessor.

Finally, Arch dedicates two lines in its response to the argument that its policy is not primary. (Dkt. 30, p. 13). Arch's position is that, because the Arch policy does not provide any coverage, it cannot be the primary coverage. For the reasons discussed above, this argument fails. Moreover, the plain language of the Arch and Catholic Mutual policies sync and concur: the Arch policy is primary over the Catholic Mutual policy.

The Diocese, as an owner and lessor, had an independent duty of care to Soriano. *See Levy v. Home Depot, Inc.*, 518 So. 2d 941, 942 (Fla. 4th DCA 1988). In facts that are undisputed, the Diocese incurred liability for having breached that duty. *See Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001) ("the duty to indemnify is dependent upon the entry of a final judgment, settlement, or a final resolution of the underlying claims by some other means"). As a matter of law, those facts arose out of the Diocese's use of the youth center. The Diocese, therefore, was an additional insured under the Arch policy.

It is ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Final Summary Judgment (Dkt. 23) is GRANTED.

2. The Clerk is directed to enter final judgment in favor of Plaintiff, Diocese of St. Petersburg, Inc., and against Defendant, Arch Insurance Company, declaring that:

   a) Defendant had a duty to defend Plaintiff in the underlying litigation; and

   b) Defendant has a duty to indemnify Plaintiff for losses incurred in defending that litigation, to include settlements, attorney's fees, and court costs.

3.      Within fourteen (14) days of this order's entry, Plaintiff may file a motion seeking

damages, costs, and reasonable attorney's fees.

4.      The Clerk is directed to close this case and terminate all pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this 24th day of May, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record